## LOPEZ v. HOWE, Immigration Com'r.

### (Circuit Court of Appeals, Second Circuit. May 14, 1919.)

### No. 216.

1. ALIENS ⊂═▷18—EXPULSION—RIGHT OF CONGRESS.
   The right of Congress to exclude or expel aliens, or any class of aliens, absolutely or upon conditions, in war or in peace, is an inherent and inalienable right of every sovereign and independent nation, which may be exercised entirely through executive officers.

2. ALIENS ⊂═▷54—DEPORTATION PROCEEDINGS—REVIEW.
   To successfully attack an order for the deportation of an alien, under Immigration Act Feb. 5, 1917, it must be shown that the proceedings upon which the order is based were unfair, or that the alien has been denied a fair hearing, or that there has been an abuse of discretion on the part of the executive officers of the United States.

3. ALIENS ⊂═▷53—DEPORTATION—GROUNDS—ANARCHICAL TEACHINGS.
   A Spanish alien, who believes and teaches anarchy as a philosophical theory, but does not advocate violence, is liable to deportation under Immigration Act Feb. 5, 1917, notwithstanding that he had been a resident in the United States for 15 years.

Appeal from the District Court of the United States for the Southern District of New York.

Proceedings to deport Frank R. Lopez for violation of Immigration Act Feb. 5, 1917. A decree of deportation was approved by the Commissioner General of Immigration and the Acting Secretary of Labor, and a warrant directing Frederick C. Howe, as Commissioner of Immigration of the Port of New York, to deport relator, was issued. From the dismissal of a writ of habeas corpus, relator appeals. Appeal dismissed, and order affirmed.

Charles Recht, of New York City (Sidney R. Fleisher, of New York City, of counsel), for appellant.

Francis G. Caffey, U. S. Atty., of New York City (David V. Cahill, Asst. U. S. Atty., of New York City, of counsel), for respondent.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. The relator has been ordered deported from this country to Spain and is in custody of the Commissioner of Immigration at the port of New York. The relator was taken into custody under a warrant which charged him with being in the United States in violation of the Immigration Act of February 5, 1917, c. 29, 39 Stat. 874. Section 3 of that act (Comp. St. 1918, § 4289¼b) provides that certain enumerated classes of aliens shall be excluded from admis-

sion into the United States. Among the classes so excluded are anarchists, and the provision referring to them may be found in the margin.[1] And section 19 of the Act (Comp. St. 1918, § 4289¼jj) provides for the arrest and deportation within 5 years after entry of any alien who at the time of entry was a member of one or more of the classes excluded by law. It then provides for the deportation of classes of aliens therein mentioned, irrespective of the time of their entry into the United States, and among those so specified is the following:

"Any alien who at any time after entry shall be found advocating or teaching the unlawful destruction of property, or advocating or teaching anarchy, or the overthrow by force or violence of the government of the United States or of all forms of law or the assassination of public officials."

The warrant charged that the relator had been—

"found advocating or teaching anarchy, or the overthrow by force or violence of the government of the United States or of all forms of law, or the assassination of public officials; that he was at the time of his entry into the United States a member or affiliated with an organization entertaining and teaching disbelief in or opposition to organized government, or teaching the duty, necessity, or propriety of the unlawful assaulting or killing of any officer, or officers, either of specific individuals, or of officers generally of the government of the United States, or of any other organized government, because of his or their official character; and that he was an anarchist or person who at the time of his entry believed in or advocated the overthrow by force or violence of the government of the United States, or of all forms of law, or who disbelieved in or was opposed to organized government, or who advocated the assassination of public officials."

An arrest followed, and the relator was taken into custody at Boston. A hearing was held in that city on June 25, 1918, and on July 22, 1918. These hearings resulted in a recommendation by the immigrant inspector at Boston that the relator be deported. The finding was that the relator—

"is an anarchist, and, in my opinion, a dangerous one, and he is teaching, through these publications that he handles, coming from all parts of the world to him, the idea of social revolution and anarchy, all of which he acknowledges in the hearing."

The findings and recommendation were submitted to the Commissioner General of Immigration and the Acting Secretary of the Department of Labor, and were reviewed by them and approved. A warrant, directing that the Commissioner of Immigration of New York deport the relator to Spain, was issued by the Acting Secretary of the Department on November 4, 1918.

[1] "* * * Anarchists, or persons who believe in or advocate the overthrow by force or violence of the government of the United States, or of all forms of law, or who disbelieve in or are opposed to organized government, or who advocate the assassination of public officials, or who advocate or teach the unlawful destruction of property; persons who are members of or affiliated with any organization entertaining and teaching disbelief in or opposition to organized government, or who advocate or teach the duty, necessity or propriety of the unlawful assaulting or killing of any officer or officers, either of specific individuals or of officers generally, of the government of the United States or of any other organized government, because of his or their official character, or who advocate or teach the unlawful destruction of property. * * *" U. S. Comp. St. Supplement 1917, p. 233 (Comp. St. 1918, § 4289¼b).

A writ of habeas corpus was obtained on behalf of the relator, and after a hearing in the United States District Court for the Southern District of New York the writ was dismissed, and on December 20, 1918, the relator was remanded to the custody of the United States Commissioner of Immigration at the port of New York.

[1] The right of Congress to exclude or to expel aliens, or any class of aliens, absolutely or upon conditions, in war or in peace has been declared by the Supreme Court an inherent and an inalienable right of every sovereign and independent nation. In Fong Yue Ting v. United States, 149 U. S. 698, 13 Sup. Ct. 1016, 37 L. Ed. 905, the court held that the power of Congress to expel might be exercised entirely through executive officers. And see Wong Wing v. United States, 163 U. S. 228, 16 Sup. Ct. 977, 41 L. Ed. 140. This doctrine was reasserted in Low Wah Suey v. Backus, Commissioner of Immigration, 225 U. S. 460, 32 Sup. Ct. 734, 56 L. Ed. 1165. In the case last cited the court said:

"A series of decisions in this court has settled that such hearings before executive officers may be made conclusive when fairly conducted. In order to successfully attack by judicial proceedings the conclusions and orders made upon such hearings, it must be shown that the proceedings were manifestly unfair, that the action of the executive officers was such as to prevent a fair investigation, or that there was a manifest abuse of the discretion committed to them by the statute. In other cases the order of the executive officers within the authority of the statute is final. United States v. Ju Toy, 198 U. S. 253 [25 Sup. Ct. 644, 49 L. Ed. 1040]; Chin Yow v. United States, 208 U. S. 8 [28 Sup. Ct. 201, 52 L. Ed. 369]; Tang Tun v. Edsell, 223 U. S. 673 [32 Sup. Ct. 359, 56 L. Ed. 606]."

[2] The present proceeding is an attack upon the order issued by the Acting Secretary of Labor directing the respondent, the Commissioner of Immigration at Ellis Island, New York Harbor, to deport the relator to Spain, the country whence he came. To successfully attack that order it must be shown that the proceedings upon which the order is based were unfair, or that the relator has been denied a fair hearing, or that there has been an abuse of discretion on the part of the executive officers of the United States.

It is asserted that the relator is not within the enumerated classes. It is admitted that he is an anarchist. The following testimony was given by the relator at the hearing before the inspector:

"Q. Do you believe in or advocate the overthrow by violence or force of the government of the United States? A. No, sir.

"Q. Any other government, Spanish, or Italian, or Mexican? A. No, sir; our ideals are founded on education.

"Q. What are your ideals? A. Free thinking.

"Q. Don't you believe in the power of authority? A. What do you mean?

"Q. Organized government. Don't you think, if the President gives an order when Congress empowers him, that it should be obeyed? A. Yes; the orders should be obeyed.

"Q. Do you believe in the propriety of assassination of public officials of the United States or any other government? A. No, sir; not only of officials, but of nobody. Everybody has a right to live.

"Q. Do you believe in anarchy? A. What do you mean by anarchy?

"Q. Well, it would be anarchy to fight against the laws of the United States, tear down buildings, blow them up. A. Anything else? I believe in anarchy, but not in the way you explain it. I believe in anarchy, but it is not the

way you explain it, or the way newspapers say anarchy is. Anarchy, the way newspapers explain it, assassinating women and children, dropping bombs, or anything like that, I don't believe in that. But I believe in teaching, educating, and telling the people to better their conditions. If you mean that, I am proud of being an anarchist. I am against killing and against destruction. We are to construct.

"Q. How are you going to proceed to do this? A. We are not going to force our ideals on anybody's mind. We have conferences; we have lectures. The doors are open, and everybody is welcome.

"Q. You try to get people through advertising means? A. Yes; for educational purposes.

"Q. For the educational purposes of teaching them anarchy? A. To teach them anarchy the way we understand it, but not the way you understand it; the way many writers understand it.

"Q. What writers? A. Tolstoi, Marx, Ferrer, Zola, Kropotkin, and many others."

[3] Because he is a philosophical anarchist, and is opposed to the overthrow of government by force or violence, the relator claims he is not within the provisions of section 19 of the act of Congress, except in the 5-year class, and that, as he has been in this country for 15 years, he cannot be deported. From what has been said in an earlier part of this opinion, it appears that the relator's understanding of the statute differs from the understanding of this court. That section deals with a number of different classes of aliens, and provides that certain classes may be deported at any time within 5 years after entry, but does not so limit the time of deportation as respects certain other classes, as to whom it is declared they may be deported, irrespective of the time of their entry into the United States. An alien at the time of his entry may not be an anarchist, and therefore may be entitled to enter. But if, at any time after his entry, he is found "advocating or teaching anarchy," he may be deported. The relator's testimony, only a portion of which has been quoted, shows conclusively that he is an advocate and a teacher of anarchy, making speeches in its favor, organizing anarchist groups, and distributing anarchist literature. As he reads and writes Spanish, Italian, Portugese, and English, he is a man of ability, who naturally has influence with his associates. That he is liable under the law to deportation admits of no doubt.

It is true he had no counsel at the hearing, but his right to counsel was not denied to him. He was asked whether he waived his right to be represented by counsel, and replied, "Well, yes." We have not discovered that any unfair advantage has been taken of him.

The fact that he is only a philosophical anarchist, and not an advocate of a resort to force and revolution, makes him, in the opinion of Congress, none the less a dangerous presence. His theories, if they could be put in practice, would end the government of the United States, and to that government he recognizes no allegiance, never having become a citizen of the United States. If the government considers his presence undesirable, because of his advocacy of a doctrine which it regards as inimical to civilization, it must have the power to send him out of the country, and back to the country whence he came.

At the hearing the following colloquy occurred:

"Q. If you are ordered deported, do you want to be separated from your wife and boy, or would you desire to have them go with you to Spain. A. It's up to the government; I think it is an injustice; I have done nothing wrong; I call it an injustice; if a man is going to be punished for his thoughts and ideas, it is an injustice."

But it cannot be an injustice to send out of the country one who has no right to remain, having forfeited whatever right he had, not because of any thoughts and ideas he entertains, but because of thoughts and ideas to which he gives utterance and advocacy, and seeks to instill into the minds of others, whom he seeks to reach and influence. Whether it is wise or unwise for such as he to be sent out of the United States is not a question upon which courts can express any opinion. That is a question for the Congress, and not for the judiciary.

A great deal was said at the argument of the distinction between philosophical anarchists and anarchist communists. The two represent very different schools of thought. There is a class of honest and law-abiding visionaries, who are convinced that the interest of society would be promoted by the abolition of all government whatsoever. Their propaganda is purely educational in character, and violence does not enter into it. They do not believe in force, or in war, or in the taking of human life. The relator evidently belongs to that class. But, while the student of social science may discriminate between philosophical anarchists and other kinds of anarchists, the act of Congress now under consideration does not; and no such discrimination is necessary, for the constitutional power to exclude or to deport does not depend upon whether the alien is or is not a criminal, or the advocate of lawless ideas.

The appeal is dismissed, and the order remanding the relator to the custody of the United States Commissioner of Immigration is affirmed.